UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

<u>MEMORANDUM
DECISION</u>
01 CV 2438 (GBD)

Plaintiff,

-against-

DOMINICK SAVINO, et al.,

Defendants.
-------------------------------------------------------------------x
GEORGE B. DANIELS, District Judge:

The Securities and Exchange Commission ("SEC") commenced this action

seeking to enjoin Dominick J. Savino ("Savino") and other named defendants from

further violations of Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15

U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"),

15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and

to disgorge the defendants of an amount equal to the value of any personal benefits

resulting from their alleged violative conduct.  The SEC alleged that defendants violated

the securities laws through fraudulent schemes to give kickbacks of cash, improper gifts,

and gratuities to co-defendant Anthony Shen ("Shen"), a bond trader employed by New

York Life Insurance Company, Inc. ("New York Life").  The SEC further alleged that in

return, the defendants obtained business and favorable bond trades at New York Life's

expense.

The SEC resolved its claims against four of the five defendants by settlement.

This Court entered final orders enjoining those defendants from further violations of the

federal securities laws and providing other relief.[1]  Defendant Savino, however, contested the SEC's allegations.

This Court held a bench trial on the SEC's claims against defendant Savino.  The SEC called three fact witnesses, co-defendant Anthony Shen, Anaaita N. Kotfal, managing director and associate general counsel for Greenwich Capital Markets ("Greenwich Capital"), and defendant Savino.  Savino further testified on his own behalf during the defense case, and called no other witnesses.

This Opinion constitutes the Court's findings of fact and conclusions of law. FED. R. CIV. P. 52 (2005).  Based upon the credible evidence adduced at trial, the Court finds that the SEC has proven by a preponderance of the evidence that defendant Savino violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5.  The Court also concludes that Savino violated Section 20(e) of the Exchange Act by knowingly aiding and abetting Shen's violations of Section 10(b) and Rule 10b-5.

---

[1] Each of the defendants that settled in this action was ordered, adjudged, and decreed permanently enjoined from further violations of the securities laws.  In addition, the Court ordered disgorgement, plus prejudgment interest on the disgorged sum.  Defendant Shen was adjudged liable for disgorgement of $278,000, plus prejudgment interest thereon; defendant Srinivas Anumolu was adjudged liable for disgorgement of $205,500; defendant Ronald W. Pinto was adjudged liable for $1,800,000 and a civil penalty of $500,000; and defendant Deborah J. Breckenridge was adjudged liable for disgorgement of $236,562.

# I.   FACTUAL DETERMINATION

## A.   Shen's Employment with New York Life

New York Life is a mutual insurance company owned by the policyholders of the insurance policies it issues.  From 1995 to 1999, New York Life, located at 51 Madison Avenue in New York City, employed Shen as a trader and analyst in its investment department.  Shen worked on the Public Fixed Income Desk, which traded investment-grade bonds, including treasury securities, mortgage securities, and investment grade corporate bonds.  The function of the Public Fixed Income Desk was to buy and hold securities to cover the risk of the insurance policies New York Life issued.  Trial Transcript ("Tr.") 25:2-26:25, 26:20-27:24.

In 1998, New York Life promoted Shen to the position of Associate Vice President.  Shen became responsible, on a day-to-day basis, for trading mortgage-backed securities on behalf of New York Life.  These securities included existing "pass-through" mortgage securities backed by government agencies; mortgage-backed securities that were not yet funded with underlying mortgages, known as "TBAs"; treasury bonds; collateralized mortgage obligations ("CMO" bonds) which are specialized mortgage-backed securities; and investment grade corporate bonds rated AAA through BBB.  Tr. 28:15-31:25, 80:16-81:1, 132:3-7, 385:5-386:11.

In 1998 and 1999, Shen possessed authority to execute trades on behalf of New York Life without obtaining prior approval from his supervisors.  In executing trades, New York Life required Shen to obtain two competitive quotes for a security before he executed a trade.  During Shen's employment, a central exchange for bond quotes did not

exist.  To obtain quotes, Shen's practice was to telephone broker-dealers, or to obtain pricing information on a Bloomberg terminal.[2]  Tr. 32:8-35:2, 50:22-51:23.

Between 1998 and January 1999, Shen's direct supervisor handled the CMO trades at New York Life.  Shen knew that his supervisor obtained gifts and kickbacks from broker-dealers in connection with his supervisor's securities trades on behalf of New York Life.  After his supervisor left New York Life in January 1999, another supervisor handled CMO trades at New York Life.  Plaintiff's Exhibit ("Pl. Exh.") 1-18; Tr. 37:3-17, 231:15-17, 272:11-274:13, 385:16-386:11.

In July 1999, Shen took medical leave from New York Life.  Around that time, New York Life commenced an internal investigation into Shen's trading activity.  Shen returned to work in October 1999.  New York Life terminated his employment one week later after the internal investigation found some of Shen's trades to be executed "off-market," that is, outside the bid/ask spread.  Tr. 136:19-25, 147:7-148:21.

### B.    Savino's Employment with Greenwich Capital

At the time of trial, defendant Savino possessed extensive experience in mortgage-backed securities.  He began work in the securities industry in July 1986.  He became a mortgage-backed securities trader in September 1988 for Banque Indosuez.  He subsequently worked as a mortgage-backed securities broker for Electronic Trading Systems, a mortgage-backed securities salesman and trader for Countrywide Securities Corporation, and as a mortgage-backed securities salesman for Credit Suisse First Boston.  In August 1998, Savino was hired as a mortgage- and asset-backed securities sales representative for Greenwich Capital.  When Greenwich Capital hired him, Savino

---

[2]  Securities professionals often used Bloomberg terminals to communicate pricing and other information.  The Bloomberg terminals possessed an "instant message" feature that allowed securities professionals to send emails to one another.

was a securities professional licensed by the National Association of Securities Dealers ("NASD"). Savino worked in Greenwich Capital's Connecticut office. Pl. Exh. 2-1, 2-2; Tr. 410:18-22.

Greenwich Capital guaranteed Savino a total compensation of the greater of $750,000 or his "net commissions," which were a portion of the gross commissions Greenwich Capital received on securities trades Savino made during its fiscal year ending September 30. Greenwich Capital recorded Savino's net commissions on trades and Savino was given credit for those net commissions. Savino's commissions were to be paid on a quarterly basis. Savino also received a $100,000 annual advance against commissions. This amount was payable in bi-weekly sums. Pl. Exh. 2-1, 2-24; Tr. 412:1-114:4.

In 1998, Savino's net commission rate was twenty-five percent of Greenwich Capital's gross commissions on risk transactions and thirty percent of gross commissions on riskless transactions. In 1999, Savino's net commission rate was twenty percent of gross commissions on risk transactions and thirty percent of gross commissions on riskless transactions. As a Greenwich Capital salesman, Savino was aware of his commissions during the quarter as they were being earned. Pl. Exh. 2-1, 2-24; Tr. 412:1-114:4.

Savino was required to follow certain regulations as a Greenwich Capital employee. Greenwich Capital was a member of the NASD. NASD Rule 3060 prohibits the making of payments or the giving of gifts valued in excess of $100 per year, by any person associated with a member firm, to an employee or agent of another person with whom the member firm is transacting business. NASD Rule 3060 also requires a record

of gifts and payments to be maintained by the member firm. Greenwich Capital maintained records of gifts and payments by its employees to employees or agents of clients.

Greenwich Capital provided to its employees its internal rules through its Compliance Manual and its Ethical Standards Policy handouts. These rules substantially tracked the NASD rules. Greenwich Capital rules did not permit its employees to make payments or give gifts valued in excess of $100 per year to any person associated with another broker, dealer, or financial institution, or the splitting of commissions with anyone outside the firm. Savino received copies of Greenwich Capital's Compliance Manual and Ethical Standards Policy handout. Savino understood these rules when he worked for Greenwich Capital. Tr. 404:3-20.

At the time of the trial, Savino continued to be employed in the securities industry. Defendant Savino was a bond trader at Greenwich Financial Services.[3] Savino continues to hold NASD series 7, series 63, and series 3 licenses. Savino's compensation in 2003 was $1.5 million. Tr. 482:12-483:12.

### C.      Shen's and Savino's Relationship

Shen's and Savino's relationship existed well before Savino began employment at Greenwich Capital. Shen engaged in trades with Savino when Savino worked for Credit Suisse First Boston and continued to do so after Greenwich Capital hired Savino in October 1997. At all times in 1998 and 1999, Shen was involved in New York Life's decisions to purchase CMOs and facilitated CMO trades at Savino' request. Tr. 183:23-190:13, 272:11-274:13, 385:16-386:11.

---

[3]  Greenwich Financial Services is not affiliated with Greenwich Capital.

In addition to their business relationship, the interactions between Shen and Savino encompassed a personal friendship as well. Shen and Savino were "close friends" with a "pretty close relationship," having socialized at least "every couple of weeks or so." Their offices were in close proximity when Savino worked at Credit Suisse First Boston. Shen had met Savino's wife and socialized with the two on numerous occasions, having also visited Savino's family home and spent the Fourth of July weekend with them. Shen testified that he and Savino were "comfortable with each other" and traded "stupid locker room kind of" remarks and "coarse language." Tr. 190, 208.

When Greenwich Capital hired Savino, Shen was, like his direct supervisor, involved in "kickbacks" and "one-way bets" with two salesmen at other broker-dealers in connection with trades he executed on behalf of New York Life. Shen used one-way bets to receive payments from broker-dealers in connection with trades. Shen's one-way bets were bets that involved no risk to Shen. If Shen won, he would receive the benefit of the bet. If Shen lost, however, he would pay nothing; instead, he would give the winner a favorable trade from New York Life. Tr. 57:16-58:21.

While at work, Shen and Savino communicated over the telephone or used Bloomberg instant-messaging emails to conduct their securities trades. Greenwich Capital used tape-recorded lines for telephone calls to its sales representatives. Its sales representatives, including Savino, were aware of this practice. Shen was likewise aware that some of the phone lines at Greenwich Capital were taped. From time to time, Shen would call Savino's cellular phone to avoid being taped. Pl. Exh. 1-18; Tr. 41:4-42:17, 42:25-45:18.

Shen knew that Savino was not paid on a commission basis at Credit Suisse First Boston and that Savino would be paid on a commission basis at Greenwich Capital. Shen's understanding was that the standard commission rate a salesman at broker-dealers was approximately thirty (30) percent of the gross profit that the broker-dealer made on the salesman's trade. Tr. 69:2-70:6.

### D.   Evidence of the Scheme to Defraud New York Life

To prove that Savino and Shen entered into a scheme to defraud New York Life, the SEC introduced evidence of the following: (1) email exchanges between Savino and Shen containing negotiations of a commission splitting agreement; (2) cash payments Savino provided Shen during high-volume trading between the two; (3) gifts that Savino promised or provided Shen in connection with trades during high volume trading between the two; (4) Savino's and Shen's email conversations showing their collusion to hide their cash and gift exchanges; and (5) conversations and other actions of Savino and Shen indicating that they knew their actions were wrong.

### 1.   Negotiations Concerning a Commission Splitting Agreement

Bloomberg email conversations between Savino and Shen on September 28, 1998 and November 12, 1998 demonstrated that Shen and Savino actively negotiated, yet failed to reach, a formula to share Savino's commissions on New York Life trades with Shen. On September 28,1998, Savino and Shen informally discussed commission splitting. Shen sent Savino a Bloomberg message, suggesting a commission sharing arrangement: "Let's work on the formula!!! 1MM 1/32== $20." In this message, Shen proposed that Savino pay Shen $20 for each "tick" he received.[4] Shen had previously

---

[4] Quotes on bonds were often given in terms of the percentage value of the bond's face value. In pricing a bond, a "tick" is equivalent to one thirty-second (1/32) of a percentage point, and a "plus" is half of that amount, or one sixty-fourth (1/64) of a

worked out similar formulas with other brokers. In his attempts to form a concrete agreement to share commissions, Shen told Savino that Shen would be able to ensure that Savino's trades with New York Life would be at "no risk" to Savino, which would have the effect of earning Savino higher commissions, because Shen would set trade prices at the outer limit of the securities' bid/ask range. Pl. Exh. 1-2; Tr. 59:8-86:3.

Savino made counter-offers to Shen during these negotiations. In the September 28, 1998 email exchange, Shen inquired of Savino "and what do I get?" in an attempt to reopen commission sharing negotiations. Savino, attempting to re-negotiate the commission sharing formula, replied "well what's your offer?" Later, in the same conversation, Savino told Shen that, with reference to working out a formula for their commission-sharing arrangement, they would "cross that bridge when they [got] there." Savino reminded Shen that he had never "said no to a real request." Pl. Exh. 1-2; Tr. 65:19-66:24, 74:4-13.

During a November 12, 1998 email exchange, Savino and Shen engaged in further negotiations for a kickback arrangement. In response to Savino's message stating "I'm always a reasonable man when dealing with reasonable men," Shen stated, "Let's work on some formulas then." Savino replied by asking Shen to give him a kickback-free first trade because Shen had a "one trade floor." This was a reference to New York Life's policy that Shen's commissions only accrue following Shen's first trade of the day. Shen replied, "U C What's wrong with this pic? It's all about u u u u u u u!" When Shen indicated his resistance to the proposed arrangement as offering too little, Savino replied that he was attempting to work out a deal. He wanted to "remit payment to [his] underpaid underappreciated buddy Anthony." Pl. Exh. 1-3; Tr. 82:9-83:21.

_____

percentage point. The dollar value of a tick is $312.50 per million of bond face value.

In the entire exchange, Savino does not tell Shen that he would not agree to any formula to share his commissions with Shen. Moreover, there is no credible evidence that Savino indicated to Shen that he was joking. Shen believed that Savino was genuinely attempting to work out a commission splitting agreement during the conversation. Tr. 62:10-20.

Several other email exchanges indicated that Savino and Shen were attempting to formulate some sort of commission sharing arrangement. First, during the course of the November 12, 1998 email negotiations over a commission sharing arrangement, Savino urged Shen to encourage Shen's direct supervisor at New York Life, to buy CMOs from Savino because Savino would receive larger commissions on CMO sales. When Shen responded that purchasing a CMO "does nothing for me," Savino told Shen that was not the case "as far as [Savino was] concerned" because having Shen on the other side of Savino's CMO deals "would be like having a sales partner," indicating that Savino would be willing to share his commissions with Shen on CMO trades Shen helped to get for Savino. Pl. Exh. 1-3; Tr. 80:1-82:8.

Shen did not inform New York Life that he was attempting to negotiate a formula to share Savino's commissions on his trades with Greenwich Capital, or that Savino had offered to enter into a commission sharing arrangement with Shen after a "one-trade floor." Shen did not know of anyone at New York Life who was aware of his discussion with Savino about splitting Savino's commissions on the New York Life trades. Tr. 74:14-22; 85:16-86:4.

## 2. Evidence of Savino's Payments in Connection with Trades

On September 8, 1998, at Savino's urging, Shen purchased a $25 million dollar bond from Greenwich Capital that Shen did not want to purchase for New York Life. At Savino's request, Shen gave Savino an additional tick on the price on that trade, which made the price less favorable to New York Life by approximately $7,812.50. On the same day, Savino engaged in a bet with Shen, whereby if Savino lost he would pay Shen $200, and if Shen lost he would give Savino a "100mm trade the day the season ends." Savino lost the bet and subsequently paid $200 to Shen, which Shen did not report to New York Life. Both Savino and Shen testified that the bet was intended as a real bet, with reasonable chances of either man winning. Regarding the proviso that Savino would have won a $100 million New York Life trade, Shen testified that he would have done trades in that order of magnitude irrespective of the bet's outcome. Pl. Exh. 2-8, 1-1, 2-9; Tr. 46:17-59:6, 278-80, 282, 354:18-355:12, 572-73.

In the three weeks following the November 12, 1998 email exchange, Shen and Savino completed four securities trades, resulting in net commissions credited to Savino of $78,867.63. One of these trades was a CMO sale to New York Life on November 20, 1998, on which Savino was credited with a net commission of $39,105. The other trades included a purchase by Greenwich Capital of a TBA bond on November 19, 1998, resulting in a net commission of $3,515.63 to Savino; a sale of a TBA bond to New York Life on November 30, 1998, resulting in a net commission of $25,000 to Savino; and a sale of a bond to New York Life on December 1, 1998, resulting in a net commission of $11,247 to Savino. Pl. Exh. 2-24; Tr. 382:15-24.

After these four securities trades, Shen applied an approximation of the commission sharing formula he suggested during the September and November email negotiations to his estimate of Savino's net commission on the December 1, 1998 trade. He asked Savino to pay him the result -- $3,000. Shen testified that he communicated his request to Savino by telephone, over a line that was not taped. Savino agreed to pay Shen the $3,000 that Savino now owed him. Savino testified that no such conversation occurred. According to Savino, he did later provide the cash, but only for entertainment unrelated to trades. Tr. 86:5-89:7.

Savino gave Shen the $3,000 during a trip they took together to Atlantic City on December 3, 1998. Before leaving for Atlantic City, Savino cashed a $6,000 check to obtain cash. Through Greenwich Capital, Savino arranged for helicopter transportation from New York City to Atlantic City with Shen and another trader from Greenwich Capital. Shen, Savino, and the third trader dined at the Hard Rock Café in the Taj Mahal casino. While there, Savino and Shen were together alone when the third trader excused himself to the bathroom. Savino then handed Shen $3,000 in cash. The cash exchange took place at Savino's and Shen's first moment alone together. Shen took the money and purchased $3,000 in chips with which to gamble at the Taj Mahal. Shen did not report the trip to Atlantic City, nor did he report the $3,000 he received from Savino in Atlantic City, to anyone at New York Life. Pl. Exh. 2-11, 2-12; Tr. 89:18-93:23.

On January 25, 1999, Savino contacted Shen in an attempt to conduct more trades with Shen. Shen wrote back to Savino that he had "no incentive 2 trade." Savino replied reminding Shen of the Atlantic City trip, and said that Shen's "no incentive" excuse "does not fly anymore [. . .] you ask you get." When Shen complained that he had not

received anything from Savino since the Atlantic City trip in December 1998, Savino agreed but said, "my point is thats what u asked for thats what u got [. . .] u want something else ask away."

Around the January 25 email exchange, Savino gave Shen periodic gifts and gratuities to ensure a flow of trades. On January 29, 1999, Savino reimbursed Shen for his hotel cost of $371.08 during the Superbowl in Florida. Savino did report this payment to Greenwich Capital on one of its travel and expense reports. In June 1999, Savino gave Shen theatre tickets to a Broadway show worth approximately $650. This gift was also recorded on a Greenwich Capital entertainment request form. Savino did not accompany Shen on the Superbowl trip, or to the theatre. Pl. Exh. 1-4,1-6, 2-13, 2-21; Tr. 95:25-98:7, 109:21-110:12.

### 3. Savino's Purchase of a Surround-Sound System for Shen

A series of email exchanges in March 1999 reflect Savino's promise to Shen that he would provide Shen a surround-sound home stereo system in connection with a securities trade. On March 12, 1999, Shen asked Savino whether he was ready to "buy that piece yet," referring to a "NSCOR" bond. When Savino requested a quote on the bond, Shen indicated that the price on the bond depended on what sort of surround system Savino would offer Shen in connection with the trade. Savino replied that a price of "28 back" from the benchmark Treasury bond price, a price which was not good for New York Life, would "equal" a surround-sound system for Shen. Savino described to Shen a surround-sound system with a digital receiver, separate sub-woofer, a center channel and four speakers, and a five-disc CD player worth approximately $3,000-$4,000. Shen agreed to sell the NSCOR bond to Greenwich Capital for "28 ticks back

from a treasury bond." Shen expected to get a surround-sound system in connection with the trade. Shen did not inform anyone at New York Life that Savino offered him a surround-sound system in connection with the NSCOR trade. That day, New York Life sold the NSCOR bond to Greenwich Capital. The trade earned Savino a net commission of $12,229.57. Pl. Exh. 1-5 , Pl. Exh. 2-24; Tr. 98:8-107:5, 109:5-14, 365:1-366:2.

In July 1999, after being reminded by Shen of his promise to purchase a surround-sound system, Savino and Shen went to Harvey Electronics in New York. Savino picked out the surround-sound system, paid for it with his personal credit card, and instructed the store to deliver the system to Shen's home. The system cost Savino $2,744.08. The system consisted of the same components described by Savino in his March 12, 1999 email exchange concerning the NSCOR trade. Neither Shen nor Savino informed anyone at New York Life or Greenwich Captial that Savino bought a surround-sound system for Shen. Pl. Exh. 1-7, 1-8, 1-9; Tr. 116:21-24; 510:21-23.

### 4. Car Service to Foxwoods Casino

On March 29, 1999, in response to Shen's request for car service for a personal trip, Savino indicated that he would obtain car service for Shen in exchange for two securities trades, replying that car service would be supplied "as long as we (u + I) do trades today and tomorrow." Shen engaged in two trades with Savino on that day, and gave Savino an additional "plus" on the price of the first trade as a bonus commission to Savino. Savino bought one TBA bond from New York Life, and sold another TBA bond to New York Life. Savino received commissions from Greenwich Capital of $7,734.37 for those two securities trades. The price on the first trade was not favorable to New York Life. New York Life overpaid as much as $12,000 because of the non-favorable

pricing. Savino gave Shen car transportation to Foxwoods Resort Casino in Connecticut. Neither Shen nor Savino told New York Life or Greenwich Capital that Shen had received car transportation from Savino in connection with those trades. Pl. Exh. 1-10, 2-24; Tr. 116:25-123:14; 356:18-20, 368:16-369:24, 510:17-20.

### 5. Adult Entertainment

On April 6, 1999, Savino sent an email message to Shen asking to purchase FNMA seven percent coupon bonds. Shen offered to sell the bonds in a "dollar roll" transaction, essentially, a sale of certain securities coupled with an agreement to re-purchase those securities at an agreed upon price on a date certain. Shen also jokingly requested a gift of approximately $50,000 worth of AOL shares. Savino responded by indicating that he would be willing to provide adult entertainment in connection with the trade.

In the first part of the trade, Greenwich Capital purchased $125 million worth of FNMA seven percent mortgage bonds for settlement on April 9, 1999. In the second part of the trade, Greenwich Capital sold $125 million worth of FNMA seven percent bonds to New York Life for settlement on May 17, 1999. Shen set the price on the sale to Greenwich Capital at a price more favorable to Greenwich Capital and less favorable to New York Life than the price Savino initially proposed. Savino received $13,183.59 in commissions from Greenwich Capital on the two trades. Subsequently in April, Savino took Shen to a strip club. Pl. Exh. 2-24; 1-11; Tr. 123:15-131:13; Savino Depo. 248:20-23.

### 6. Arizona Trip

In May 1999, Shen was planning a personal vacation to Arizona and discussed his vacation plans with Savino. During those discussions, Savino offered to pay for Shen's hotel room during the vacation. On May 10, 1999, Shen went to dinner with Savino. At the dinner, Savino and Shen discussed a potential sale of a CMO bond from Greenwich Capital to New York Life. On the following day, Savino sent Shen an email message asking if New York Life still wanted to buy the CMO bond. Savino told Shen that Shen should do two things: buy the CMO bond and "get me the hotel phone number before its too late." Savino subsequently sent Shen an email message stating that Shen's cap for the hotel room was $2,500 and that $1,000 of that cap was "dependent on this [CMO trade] getting done." Shen agreed to purchase the CMO from Greenwich Capital. On May 11, 1999, Savino sold New York Life a CMO bond on which he made $53,547.30 in net commissions. Pl. Exh. 1-12, 2-24; Tr. 137:1-142:23.

After Shen returned from his vacation in Arizona, he had a disagreement with Savino over Savino's promise to pay for Shen's hotel bill. Shen told Savino that the hotel bill was $5,500. On June 9, 1999, Savino said to Shen in an email message "evry single time we agree to something you back away I offd and agreed to 25 you said you would let me knoew when . . . is now when?" Savino complained to Shen that he had already given Shen theatre tickets and car transportation to Foxwoods casino, and that he was not willing to pay more than the $2,500 he offered for Shen's hotel bill. In response, Shen told Savino that Savino was not giving Shen sufficient gifts and payments and that he would stop trading securities with Savino. Ultimately, Shen did not receive payment for this trip. Shen did not tell anyone at New York Life that Savino offered to reimburse

Shen for his hotel room in connection with the May 11, 1999 purchase of the CMO. Pl. Exh. 1-13, 2-24; Tr. 142:24-147:6; 377:13-378:21.

### 7. Other Evidence of Conscious Wrongdoing

In email exchanges, both Shen and Savino indicated their understanding that their securities trades were executed at prices less favorable to New York Life than otherwise obtainable. They thought that this variance would not be noticed because these prices were within the bid/ask spread. In a Bloomberg email exchange on April 9, 1999, Shen complained to Savino that someone in another branch of New York Life's Public Fixed Income Desk was examining his trades. In response, Savino asked Shen if it was because Shen executed trades "off market," that is, outside the bid/ask spread. When Shen told Savino he was doing the same as Savino, executing off-market by one-quarter of a tick, Savino replied "it's a bid offer spread, no problem," that is, no one would notice that the prices were less favorable to New York Life because the prices were not materially off-market. Pl. Exh. 2-18; Tr. 132:17-136:19.

Finally, during their negotiations over a commission sharing formula in September 1998, Savino and Shen confirmed that each was deleting and purging their email messages in order to conceal their exchanges. Shen believed that by doing so, the email messages could not be retrieved later. Savino first brought up the topic of deleting the email messages. During their September 28, 1998 email discussion, Savino told Shen, "[b]y the way, you best be deleting these messages as you get them." Shen responded to Savino's direction to delete the emails with the comment "[a]nd purge them please." Savino informed Shen that Savino used the "[a]uto-purge" function of the

Bloomberg terminal, which automatically purges deleted emails from the computer system. Pl. Exh. 1-2; Tr. 70:17-72:17, 578:1-23.

### E.    Investigations into Savino's New York Life Trades

On or about April 26, 2000, New York Life approached Greenwich Capital and stated that it was damaged because of kickbacks that Savino gave Shen in connection with their trades. Greenwich Capital general counsel's office initiated an investigation into all of Greenwich Capital's securities trades with New York Life, focusing on trades executed by Savino. Tr. 416:7-418:23.

In or around March 2000, after his termination, Shen learned that a number of employees in the Investment Department and Public Fixed Income Desk at New York Life were also recently terminated. On March 21, 2000, Shen called Savino at Greenwich Capital to warn him against soliciting trades with New York Life by offering gifts and entertainment in connection with the trades, as Savino had done with Shen. Shen was aware that the line was being taped by Greenwich Capital because of the audible tone on the line. Shen was concerned that Savino could "unravel the whole deal we had," that is, uncover the fraudulent arrangement between the two, if Savino contacted the remaining New York Life employees to try to sell bonds. Shen warned Savino not to start "anything stupid" with New York Life and implored him to do him a favor "and don't get in trouble." Savino responded to Shen by asking if the other New York Life employees were terminated because of the gifts and entertainment Shen received in connection with his trades at New York Life. Pl. Exh. 1-14, 1-15; Tr. 149:7-159:3.

Savino was questioned in the internal investigation. Savino lied to the investigators. He denied giving Shen any money in Atlantic City, and instead falsely claimed that he borrowed $500 from Shen during that trip. Savino also denied that he gave Shen a surround-sound system. Tr. 431:3-432:23, 438:10-439:9.

After the initial interview of Savino by Greenwich Capital's attorneys, Greenwich Capital asked Savino to cooperate in their investigation into his trades with New York Life by, among other things, contacting Shen and obtaining Shen's consent to be interviewed by Greenwich Capital. Savino instead called Shen and asked Shen to call back and leave a recorded message expressing Shen's desire not to be interviewed by Greenwich Capital's attorneys. Savino told Shen that Savino already supplied Greenwich Capital's attorneys a false story, that there was nothing in the way gifts exchange between Savino and Shen that was material to the investigation. He asked Shen to corroborate Savino's false story, which Shen did. Tr. 161:10-165:2, 434:12-436:13.

Also, after their initial interview of Savino, Greenwich Capital's attorneys asked for and received Savino's financial records, including Savino's personal credit card statements. On June 22, 2000, Shen called Savino at Greenwich Capital. During that call, Savino told Shen that because Savino paid for the surround-sound system on his credit card, the purchase was "traceable" and "not invisible," and "would find its way to the light of day." However, Savino urged Shen to stick to the story that he had never given Shen any money. Savino told Shen that other than the money, "everything else I'm going to tell the truth about." When Shen attempted to discuss the cash Savino gave him in Atlantic City, Savino cut him off because Savino did not want Shen discussing the

cash during a call that was possibly being recorded by Greenwich Capital. Savino knew that if Greenwich Capital learned about the cash, he would lose his job. Pl. Exh. 1-7, 1-16, 1-17; Tr. 168:19-169:20, 433:24-434:7, 515:16-516:1.

Because Savino knew that the stereo he gave Shen would be discovered from his credit card receipts, in or around July 2000, he disclosed its purchase to Greenwich Capital. When Greenwich Capital learned of the stereo, Savino was involuntarily terminated effective August 1, 2000. Savino never informed Greenwich Capital about the $3,000 Savino gave to Shen in Atlantic City. Pl. Exh. 3-7; Tr. 439:10-441:6, 484:11-12, 514:3-10, 515:12-14.

Greenwich Capital settled New York Life's claim arising out of the trades between Savino and Shen with a payment to New York Life of $800,000. On March 22, 2001, Shen entered a guilty plea to conspiracy to commit securities fraud, mail fraud, wire fraud, and commercial bribery. The criminal charge against Shen arose from his securities trading activities in 1998 and 1999, schemes to defraud involving "one way" bets between Shen and sales persons at brokerage firms, and Shen's receipt of other kickbacks for trades from those salespersons. Shen did not have a cooperation agreement with the government, but voluntarily cooperated with the government's investigation. Shen was sentenced to three years probation including 1000 hours of community service and restitution to New York Life. Pl. Exh. 1-18, 1-19; Tr. 37:23-40:20, 45:13-18, 441:7-441:11.

Subsequent to Greenwich Capital's investigation, Savino was deposed in connection with his trades with New York Life. Savino stated in his deposition that he did not ask Shen to lie about the surround-sound system to the attorneys for Greenwich

Capital. During his deposition, Savino stated that he gave Shen between $1,000 and $1,500 in Atlantic City because Shen was teaching Savino how to play blackjack. Savino claimed during his deposition that he purchased a stereo for Shen as a "housewarming gift" because he felt guilty that he had not done anything for Shen. Savino also claimed that his negotiations with Shen and his offers of gifts to Shen in connection with trades were just a "joke." Savino Depo. 25:9-11, 26:5-178, 186:2-187:5

### F.    Savino's Defense

In his post-trial memorandum, Savino contends that the SEC did not meet its burden of proof at trial. Savino argues that the testimony at trial and email exchanges introduced as evidence did not show a scheme to defraud New York Life. Rather, Savino argues that the emails evidenced a "disjointed pattern of joking mockery, posturing and good natured abuse." Savino differentiated his relationship with Shen from the "real kickback agreements" Shen entered into with other co-defendants. Those kickback agreements were delivered in cash, per an understood code or specific agreement. Savino argued that the absence of those circumstances in this instance demonstrates the lack of a scheme to defraud here. Def. Post-trial Memo. at 4, 9.

Savino also argues that the favorable pricing that Greenwich Capital received from New York Life was not the product of a scheme to defraud. Savino relied on Shen's testimony that a broker-dealer "could not have the best executable price and still win a bid[,]" if the firm "provide[d] research value" for instance. Savino further argues that Greenwich Capital provided New York Life with its proprietary research at Shen's request. This, Savino argued, was the true cause of the favorable pricing that Greenwich Capital received on its trades with New York Life. Finally, Savino argues that Shen's

testimony did not demonstrate that, by design, Savino hid from New York Life the fact that he received gifts. Savino argues that Shen's testimony suggests that Shen may have told his supervisors about some of the gifts he received. Def. Post-Trial Memo. at 11-12.

### G. Savino's Commissions

Pl. Exh. 2-24 lists approximately sixty-seven securities trades between Shen and Savino in 1998 and 1999. It also shows, for each trade, the amount of the gross commission Greenwich Capital made and the amount of net commission credited to Savino.

In the fiscal year ending September 30, 1998, Savino's net commissions did not exceed the minimum annual compensation guaranteed by Greenwich Captial.[5] As a result, Savino received a pro rata share of his minimum guaranteed salary of $750,000 from Greenwich Capital. In the fiscal year ending September 30, 1999, Savino's net commissions exceeded the minimum guaranteed annual compensation, and he received approximately $1,000,000 in compensation. Pl. Exh. 2-1, 2-24; Tr. 410:23-414:3.

In fiscal year 1999, Savino received $366,358.04 in net commissions from trades between New York Life and Greenwich Capital. In October, Savino was credited with $1,085.94. In November, Savino was credited with $86,787.30 in commissions. In December, Savino was credited with $11,872. In January, Savino was credited with $1,250 in commissions. In February, Savino was credited with $21,735.69 in commissions. In March, Savino was credited with $71,313.35 in commissions. In April, Savino was credited with $21,589.85 in commissions. In May, Savino was credited with

---

[5] In fiscal year 1998, in the months of August and September, Savino was credited with commissions totaling $105,885.41 from trades between New York Life and Greenwich Capital. In August, Savino was credited with $5,625 in commissions. In September, Savino was credited with $100,260.41 in commissions.

$95,052.04 in commissions.  In June, Savino was credited with $16,609.37 in commissions.  In July, Savino did not receive commissions in connection with New York Life trades.  In August, Savino was credited with $39,062.50 in commissions.  After August 1999, Savino received no further commissions in connection with trades with New York Life.

## II. Conclusions of Law

### A. Counts 1 and 2 – Direct Violation of the Federal Antifraud Statutes

The evidence in this case established by a preponderance of the evidence that Savino violated both Sections 10(b) of the Securities Exchange Act[6] and Section 17(a) of the Securities Act.[7]

In order to meet its burden of proof, the government must establish by a preponderance of the evidence each of the following elements: (1) that the defendant employed a device, scheme, or artifice to defraud in connection with the sale of a security; (2) that the victim justifiably relied on the defendant's statements or conduct;

---

[6]     Section 10(b), which applies to both buyers and sellers, makes it

unlawful for any person . . .[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

[7]     Section 17(a), which applies only to sellers or offerors, states:

It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportations or communication in interstate commerce or by the use of the mails directly or indirectly – (1) to employ any device, scheme, or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

Pursuant to its rulemaking power under this section, the SEC promulgated Rule 10b-5, which provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made not misleading, or (c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.  17 C.F.R. §240.10b-5.

(3) that the defendant acted with intent to defraud or with reckless disregard for the truth; (4), that the defendant's conduct was the proximate cause of the injury to the victim; and (5) that the defendant used, or caused to be used, means and instrumentalities of interstate commerce. Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754 F.2d 57, 61 (2d Cir. 1985).

The purpose of § 10(b) and Rule 10b-5 is to protect persons from being deceived in securities transactions – to make sure that buyers of securities get what they think they are getting and that sellers of securities are not tricked into parting with something for a price known to the buyer to be inadequate, or for a consideration known to the buyer not to be what it purports to be. Chemical Bank v. Arthur Anderson & Co., 726 F.2d 930, 943 (2d Cir. 1984).

Savino's liability is primarily predicated on five factual circumstances: (1) Savino failed to disclose the fact that he was compensating Shen in connection with trades; (2) Savino did not disclose that as a result, Shen was trading securities at prices unfavorable to New York Life; (3) Savino's compensation to Shen in connection with the trades to cause Shen to trade prices unfavorable to New York Life was information material to New York Life; and (4) during the course of their arrangement, Savino and Shen took affirmative steps to conceal conduct that they knew was illegal; and (5) in carrying out this scheme, Savino used the means and instruments of interstate commerce.

### 1. Scheme to Defraud in Connection with the Purchase or Sale of a Securities

The record demonstrates that beginning in September 1998, Shen and Savino reached agreements constituting an illegal scheme to defraud New York Life. Savino attempted to enter into a commission splitting formula to compensate Shen for increasing Savino's commissions by giving Savino New York Life trades at favorable prices. The evidence also demonstrates that Savino and Shen, at times, implemented a "you ask, you get" compensation arrangement. To wit, in December 1998, Savino gave Shen $3,000 in cash in Atlantic City to compensate Shen for giving Savino New York Life Trades; in spring of 1999, Savino promised and gave Shen a surround-sound system in connection with New York Life trades; in March 1999, Savino promised and gave Shen car transportation to Foxwoods Resort Casino in connection with New York Life Trades; in April 1999, Savino promised and gave Shen adult entertainment in connection with New York Life trades; and in May 1999, Savino promised to give Shen $2,500 toward his vacation hotel bill in connection with New York Life Trades.

Savino and Shen did not reach a concrete commission sharing formula in their September and November exchanges. However, the credible evidence demonstrated that the $3,000 Atlantic City payment was made to facilitate certain trades. Savino made cash payments to Shen, which Shen credibly testified were in connection with several trades. Increased trading between Shen and Savino around the time of the negotiations corroborated this testimony. Shen and Savino's email exchanges during this time further support this conclusion.

The evidence demonstrates that Savino obtained a flow of trades, and therefore more commissions, by offering and making payments and giving gifts to Shen. As part

of his arrangement with Savino, Shen gave Savino additional ticks and plusses on trades
to allow Savino to increase his profits. Further to the arrangement, Shen did not obtain
competitive bids on the trades from other broker-dealers. Savino obtained specific
favorable trades with his promises and provision of payments and gifts to Shen in
connection with those trades. Moreover, the evidence demonstrates that Savino's flow of
trades with New York Life increased substantially during those periods when he was
negotiating and making payments to Shen, and when he promised and provided gifts to
Shen in connection with those trades. Indeed, Savino's most lucrative months were those
when he was negotiating a potential commission splitting arrangement with Shen.[8]

## 2. Material Misrepresentations and Ommissions

Savino made material misrepresentations and omissions in connection with its
trades. Savino concealed the fact that he was compensating Shen in connection with his
trades. Savino also concealed the fact that Shen was trading New York Life's securities
at less than favorable prices because of Savino's promises and gifts. Savino
affirmatively misrepresented the nature of the consideration he paid New York Life for
his trades. See Feminella, 947 F. Supp. at 732 (allegations that defendant concealed from
his client that the consideration paid on certain security trades included money that he
intended to, and did, kickback to his purchaser sufficient to state a claim).

These misrepresentations and omissions were material in that they involved
information that a reasonable investor would consider important in the decision to buy or

---

[8]    In September and November 1998, Savino's credited net commissions on his Shen
trades totaled $100,260.41 and $86,787.30 respectively. In March and May of 1999, months in
which Savino promised Shen large gifts and payments, Savino's net commissions on his Shen
trades totaled $71,313.35 and $95,052.04 respectively.

sell securities.  Schlick v. Penn-Dixie Cement Cor., 507 F.2d 374 (2d Cir. 1974).  Both

New York Life and Greenwich Capital were entitled to know that Shen was being

promised and given cash, gifts, and gratuities by Savino in connection with trades.  See

In re Stephes, Inc., 1998 WL 807950, at *7 (68 S.E.C. Docket 1801, Nov. 23, 1998)

(secret kickback arrangements material because "they are always corrupting"); In re First

Fidelity Sec. Group, 1996 WL 20840, at *7 (61 S.E.C. Docket 40, Jan. 9, 1996) (secret

payments to agent material 'because such arrangements and payments could compromise

the independence and judgment of these agents").

### 3.  Scienter

Savino acted with the requisite scienter.  He intentionally did not disclose and

intentionally concealed the material circumstances of his trading relationship with Shen.

Savino understood that he owed a duty to treat his customers fairly and to disclose to his

customers all information that was relevant to the trades he handled, including all forms

of consideration given in connection with his trades.  Despite acknowledging his duties to

his customers, Savino admittedly never told his employers or New York Life that Shen

was soliciting gifts and payments, nor did he disclose that he gave Shen gifts and

payments.

During the course of their arrangement, Savino and Shen knew that their conduct

was wrong, and took affirmative steps to conceal it.  Savino was aware of the NASD and

Greenwich Capital rules prohibiting certain types of gifts, yet he disregarded these rules

in his dealings with Shen.  Savino waited until he and Shen were alone before he gave

Shen the $3,000 payment in Atlantic City.  Savino also used his personal credit card to

purchase the surround-sound system for Shen in order to avoid detection.  Savino did not

report the payments, gifts, or gratuities he gave Shen in connection with their trades on the travel and expense forms he submitted to Greenwich Capital. Moreover, Savino's intent to defraud is further demonstrated by his instructions to Shen to continue to conceal their scheme after Greenwich Capital began to investigate his trades with New York Life.

Both Shen and Savino understood that their securities trades were executed at prices less favorable to New York Life than what was otherwise obtainable. They thought that this variance would not be noticed because these prices were within the bid/ask spread. Savino was aware that Shen was receiving gifts from other broker-dealers and that Shen sought payments and gifts in connection with certain trades. Savino was also aware that Shen's former supervisor at New York Life sought gifts in connection with trades until he left in January 1999.

Other than Shen's expectation of gifts or payments in connection with his trades with Savino, there was no credible reason for Shen to engage in securities trades in the manner they were conducted. Savino argues that "[a]s to those rare occasions where Mr. Shen even arguably made concessions within the spread in Greenwich Capital's favor . . . Mr. Savino was perfectly justified in believing that such gestures were in recognition of the unique and valuable advice that his employer provided on an ongoing basis to New York Life. *See* Def. Post-Trial Memo at 3. There is no credible evidence, however, that these were "concessions" for any research or other legitimate service in connection with trades.

Savino's explanation and testimony were not credible during the trial. He testified that his offers of gifts and payments to Shen were not connected with his trades

with Shen.  This testimony that is contradicted by logic and, among other evidence, the words of his own emails to Shen.  He also testified that he did not ask Shen to lie to the attorneys from Greenwich Capital investigating his trades.  That testimony is contradicted by Shen's testimony that Savino asked him to corroborate Savino's story that there had been no gifts or payments made by Savino, and by Savino's own statements during the taped conversations between Savino and Shen.  Savino's claim at trial that his email discussions with Shen were just "jokes" is a characterization that flies in the face of all the evidence.  Savino's incredible testimony that his misconduct was simply a "joke" is undercut by, among other evidence, his own statements in his emails to Shen emphasizing his willingness to give Shen the gifts Savino offered, and by Savino's own admissions that he gave Shen the gifts and payments he offered in connection with trades.

The Court accepts that much of the email relationship between Savino and Shen show a "disjointed pattern of joking, mockery, posturing, and good-natured abuse."  Def. Post-Trial Memo at 4.  Indeed, the joking nature of these email exchanges was consistent with their long-term friendship.  Despite the light-hearted nature of many of the communications between Savino and Shen, the evidence demonstrated that, underlying the ostensibly jocular conversation, Savino and Shen reached agreements to exchange cash and gifts in connection with trades.  Moreover, Savino was willing to further negotiate as opportunities arose.

### B.        Count 3 – Aiding and Abetting Shen's Violations of the Federal Antifraud Statutes

The SEC's Third Claim charges that Savino violated Section 10(b) of the Exchange Act by knowingly aiding and abetting Shen, in violating Section 19(b) and

Rule 10b-5.[9]  To prove its case under the Third Claim, the SEC must show that (1) Shen committed at least one violation of Section 10(b) and Rule 10b-5 (a "primary violation"); (2) Savino either knew of Shen's primary violations, or was reckless in not knowing of the violations; and (3) Savino substantially assisted Shen's primary violation.  SEC v. Lybrand, 200 F. Supp.2d 384, 399-400 (S.D.N.Y. 2002).

In proving these elements, the SEC must persuade the Court by a fair preponderance of the evidence.  See e.g., Securities and Exchange Comm. v. Commonwealth Chemical Securities, Inc., 574 F.2d 90, 102 (2d Cir. 1978).  The SEC is not required to prove reliance or actual harm or damages resulting from conduct violating the securities laws in order to obtain relief.  Graham v. SEC, 222 F.3d 994, 1001 n.15 (D.C. Cir. 2000); SEC v. McCaskey, 2001 WL 1029053, at *5 (S.D.N.Y. Sept. 6, 201).

The record shows that (1) Shen committed at least one violation of Section 10(b) and Rule 10b-5; (2) Savino knew of Shen's primary violations; and (3) Savino substantially assisted Shen's primary violations.  Shen committed primary violations of Section 10(b) and Rule 10b-5 when he failed to disclose to New York Life the payments and gifts offered and made in connection with his securities trades.  See United States v. Rudi, 902 F.Supp. 452, 456-57 (S.D.N.Y. 1995) (agent defrauded his principal by accepting secret payments from underwriter).  Shen's actions resulted in his criminal conviction.

---

[9] 15 U.S.C. § 78t(f) authorizes the SEC to bring claims for aiding and abetting a violation of the securities laws.  It states in pertinent part:
>    For the purposes of any action brought by the Commission under paragraph (1) or (3) of section 78u(d) of this title, any person that knowingly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

The evidence demonstrated that Savino was aware that Shen was defrauding New York Life by soliciting and accepting payments, gifts, and gratuities in connection with securities transactions. Indeed, Savino was on the other side of transactions amounting to Shen's primary violation. Savino knew Shen was making materially false and misleading statements and omissions to New York Life in connection with the securities trades he conducted. Savino's efforts to conceal the scheme emphasized his awareness that he and Shen were defrauding New York Life. Early in their relationship, for example, Savino urged Shen to delete and purge incriminating Bloomberg email messages, and further suggested that Shen use the computer's "auto-purge" feature to ensure that the incriminating messages were purged.

Savino substantially assisted Shen's primary violation by offering and giving Shen secret payments, gifts, and gratuities in connection with their securities trades. For example, in December 1998, Savino gave Shen $3,000 in cash in Atlantic City to compensate Shen for giving Savino New York Life Trades. In spring of 1999, Savino promised and gave Shen a surround-sound system in connection with New York Life trades. In March 1999, Savino promised and gave Shen car transportation in connection with New York Life Trades. In April 1999, Savino promised and gave Shen adult entertainment in connection with New York Life trades. In May 1999, Savino promised to give Shen $2,500 toward his vacation hotel bill in connection with New York Life Trades.

### III.    Equitable Remedies

#### A.    Permanent Injunction

The SEC seeks permanent injunctive relief against Savino pursuant to Section 20(b) of the Securities act and § 21(d) of the Exchange Act, both of which provide that "upon a proper showing a permanent or temporary injunction or restraining order shall be granted."  A district court is given wide discretion to enjoin possible future violations of the federal securities laws in view of a showing of past violations, when "there is a reasonable likelihood that, unless enjoined, the violations will continue."  First Jersey Securities, 101 F.3d at 1477; SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1100 (2d. Cir. 1972).  In determining whether a proper showing has been made, the Court must find a reasonable likelihood that past wrongdoing will recur.  See SEC v. Bausch & Lomb, Inc., 565 F.2d 8, 18 (2d Cir. 1997).  To make this showing the SEC is required to go beyond the mere facts of past violations.  See SEC v. Commonwealth Chemical Securities, Inc., 574 F.2d 90, 100 (2d Cir. 1978).  The SEC must prove that a violator has a propensity to engage in future violations.  See id. at 99. The Court is mindful, however, that "fraudulent past conduct gives rise to an inference of a reasonable expectation of continued violations."  Manor Nursing Centers, 458 F.2d at 1100.

Additional factors that weigh in the Court's determination include (1) the degree of the scienter involved; (2) the sincerity of the defendant's assurances against future violations; (3) the defendant's recognition of the wrongful nature of his conduct; and (4) the degree to which the defendant's professional occupation will affect the chance of recurring violations.  See SEC v. Universal Major Industries, 546 F.2d 1044, 1048 (2d Cir. 1976).  Unlike a nonstatutory injunction, there is no requirement that the SEC

demonstrate irreparable injury or lack of any adequate remedy at law.  See SEC v. Management Dynamics, Inc., 515 F.2d at 808.  The Court, however, will engage in the traditional balancing of the equities before issuing an injunction.  SEC v. Geon Industries, Inc., 531 F.2d 39, 54-55 (2d Cir. 1976).

The level of scienter involved in Savino's violations is high.  Savino knowingly and willingly defrauded New York Life, and knowingly and willingly aided and abetted Shen in Shen's own violations of the federal security laws.  Savino's violations were repeated multiple times over the course of his relationship with Shen.  Savino has been unwilling to admit that he engaged in wrongdoing with Shen, and continues to claim that the scheme was all a joke, despite overwhelming evidence to the contrary.  Savino was untruthful during his deposition and in his testimony during trial.

Due to his current occupation as a licensed securities professional trading bonds for a broker-dealer, Savino is in a position to engage in further fraudulent conduct.  See Charles Hughes & Co. v. SEC, 139 F.2d 434, 437 (2d Cir. 1943) ("[t]he business of trading in securities is one in which opportunities for dishonesty are of constant recurrence and ever present").  An injunction shall issue to deter future illicit conduct by defendant Savino.

### B.       Disgorgement

The SEC further seeks disgorgement of Savino's ill-gotten gains in connection with his New York Life trades, and prejudgment interest in connection with this amount. Disgorgement of ill-gotten gains is also appropriate in actions to enforce the federal securities laws. See SEC v. Fishbach Corp., 133 F.3d 170, 175 (2d Cir. 1997); *First Jersey Securities*, 101 F.3d at 1474-75. Disgorgement is an equitable remedy. SEC v. UNIOIL, 951 f.2D 1034 (D.C. Cir. 1991). The Court need only make a reasonable approximation of the profits causally connected to the fraud. SEC v. Warde, 1512 F.3d 45, 50 (2d Cir. 1998). "The proper measure of disgorgement is the amount of the wrongdoer's unjust enrichment." SEC v. Falbo, 14 F. Supp.2d 508, 527 (S.D.N.Y. 1998). The Court will order disgorgement of Savino's total fiscal year 1999 commissions from trades between New York Life and Greenwich Capital for Savino's fiscal year 1999 commissions. The Court will further order prejudgment interest on the disgorgement sum.

In fiscal year 1999, $366,358.04 of Savino's total commission compensation was attributable to his New York Life trades with Shen. The commissions that Savino earned from these trades were a result of the continuing scheme to defraud New York Life. Disgorgement of Savino's 1999 commissions is therefore appropriate.

In fiscal year 1998, Savino did not receive payment for the net commissions for which he was credited because his net commissions were less than his minimum guaranteed salary of $750,000. The SEC argues that Savino's 1998 compensation from, and retention by, Greenwich Capital was related to his production of commissions, including the commissions generated from Savino's New York Life trades. Because

Savino's guaranteed salaried payment of $750,000 in 1998 was not in fact commissions generated by the fraud, however, this Court will not order disgorgement of his 1998 salary.

The interest rate used to calculate the amount of pre-judgment interest is the rate set by the Internal Revenue Service for money owed to the United States Treasury, which is the rate that best approximates the use value of Savino's ill-gotten gains. See 26 U.S.C. § 6621(a)(2); SEC v. First Jersey Securities, Inc., 101 F.3d 1450, 1476 (2d Cir. 1996). The pre-judgment interest should be calculated by the SEC on Savino's total commissions on New York Life trades in Greenwich Capital's fiscal year of 1999, that is, trades occurring between October 1, 1998 and September 30, 1999. As requested by the SEC, interest on each trade is to be calculated from the first day of the month following the trades that earned the commissions through the date of this judgment.[10]

---

[10] In its papers, the SEC requests prejudgment interest on each New York Life trade, beginning to accrue on the first day of the month following the trade. Defendant Savino does not object to the date proposed by the SEC.

**D.          Civil Money Penalties**

The SEC further requests that the Court order payment of a civil monetary penalty.  Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 77t(d), 78u(d)(3), provide for the payment of civil monetary penalties in SEC enforcement actions.  "The amount of the penalty shall be determined by the court in light of the facts and circumstances." Id.  The statutory scheme provides three tiers of penalties of increasing severity.[11]  The SEC argues that the Court should order Tier Three penalties against defendant Savino in the amount equal to his disgorgement.

Tier Three penalties are available if the violation involved "fraud, deceit, manipulation or reckless disregard of a regulatory requirement," and if the violation "resulted in substantial losses or created a significant risk of substantial losses or created a risk of substantial losses to other persons."  The Tier Three statutory maximum penalty is the greater of $100,000 per natural person or "the gross amount of pecuniary gain to such defendant as a result of the violation." 15 U.S.C. § 77t(d)(2) (2006).

The Court considers the following factors in determining the amount of the penalty: (1) the egregiousness of the defendant's violations; (2) the level of scienter involved; (3) the repeated nature of the violations; (4) the defendant's willingness to admit his wrongdoing; (5) the losses or risk of loss the defendant's misconduct caused to others; (6) the defendant's cooperation and honesty with authorities; and (7) the defendant's current and future financial situation.  See Lybrand, 281 F.Supp.2d at 730. This Court has also considered whether the defendant concealed his conduct and whether

---

[11] Each tier provides a maximum penalty as the greater of "the gross amount of pecuniary gain to such defendant as a result of the violation" or a statutory penalty.  The Tier One statutory penalty is $5,000 per natural person.  Tier Two penalties are available if the violation involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement."  The Tier Two statutory penalty is $50,000 per natural person.  15 U.S.C. § 77t(d)(2) (2006)

he is employed in the securities industry.  <u>SEC</u> v. <u>Falbo</u>, 14 F.Supp.2d 508, 528-29 (S.D.N.Y. 1998).

The Tier Three penalty is appropriate here.  This Court orders defendant Savino to pay a civil monetary penalty of $100,000 in addition to the disgorgement and prejudgment interest.  Savino's actions satisfy the statutory requirements for the imposition of Tier III penalties.  Savino's violations involved "fraud, deceit, manipulation, or deliberate or reckless disregard of regulatory requirements"  In addition, Savino's violations directly resulted in substantial losses its victims.

Savino's violations are egregious.  They were committed while Savino was a licensed security professional employed in the securities industry.  As a registered representative of Greenwich Capital, Savino possessed a duty to fully inform his clients as to all consideration involved in each security trade.  Savino violated his duties by engaging in an illegal fraudulent scheme with Shen.  Savino has been unwilling to admit that he engaged in wrongdoing, contending that the fraudulent scheme was in jest.  The evidence also reveals that Savino attempted to obstruct the investigation conducted by authorities.  Savino lied to the attorneys at Greenwich Capital when they were conducting an internal investigation.  Savino also urged Shen to lie to investigators to further conceal their scheme.  Savino's lack of cooperation and candor continued with his untruthful statements concerning his conduct during his deposition, and at trial.  Finally, Savino's current and future financial situation further supports the imposition of the statutory monetary penalty.  The record shows that at the time of trial, Savino continued to be employed in the securities industry.  Savino's tax returns for the year before the trial reflected that his income exceeded $1,500,000.

An appropriate judgment and order shall issue consistent with this memorandum

decision.

Dated: New York, New York
       February 16, 2006

SO ORDERED:

*George B. Daniels*

GEORGE B. DANIELS
United States District Judge